Gorman, J.
 

 Three questions are presented to this court for its determination. First, did the original indictment state facts showing an offense under the laws of Ohio ? Second, if it did not, did the court have the power to permit the insertion of the words “and maliciously”? Third, did the facts warrant a conviction of Childers of shooting with intent to wound, under the provisions of Section 12420, General Code?
 

 That section, which is the one under which the defendant, Childers, was indicted, provides that “who-' ever maliciously shoots * * * another person with intent to kill, wound, or maim such person,” shall be guilty of a felony. The indictment as returned charged that the defendant “unlawfully shot one Daniel Earl Wagoner with intent to wound him, the said Daniel Earl Wagoner.”
 

 It will be noticed that the words “and maliciously” are omitted from the indictment. If the omission of these words is a vital and material element identifying or characterizing the offense, even under the broad provisions of Sections 13437-4 and 13437-29, General Code, an amendment could not cure the defect.
 
 Harris
 
 v.
 
 State,
 
 125 Ohio St., 257, 181 N. E., 104.
 

 The wording of indictments must conform to the provisions of Section 13437-4, General Code, which reads as follows:
 

 “In chárging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public
 
 *511
 
 offense therein specified. Such statements may he made in ordinary and concise language without any technical averments or any allegations not essential to he proved. It may be in the words of the enactment describing the offense or declaring the matter charged to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is charged. ’ ’
 

 It will be noticed that it is not necessary to use the exact words of the statute, but if in substance the indictment contains averments showing that the accused committed some public offense the requirements of the section are met.
 

 Even before the enactment of the statute, while it was approved practice, it was not necessary that the identical words of the statute be used in an indictment.
 
 Loeffner
 
 v.
 
 State;
 
 10 Ohio St., 598;
 
 Rufer
 
 v.
 
 State, 25
 
 Ohio St., 464, 468;
 
 Price
 
 v.
 
 State;
 
 35 Ohio St., 601. If the language employed included all the statutory elements with reasonable clarity and certainty, the indictment could not be successfully attacked.
 
 Stoughton
 
 v.
 
 State, 2
 
 Ohio St., 562;
 
 State
 
 v.
 
 Groves,
 
 80 Ohio St., 351, 88 N. E., 1096;
 
 State
 
 v.
 
 Toney,
 
 81 Ohio St., 130, 90 N. E., 142;
 
 Burke
 
 v.
 
 State,
 
 104 Ohio St., 220, 135 N. E., 644.
 

 Of course the act in question must be done maliciously in order to warrant a conviction of the crime charged, and that fact must be proved and found by the jury to exist. If the indictment does not contain words that, in substance, state that the act was done maliciously it would be defective.. However, if equivalent words are used, the exact terms in the statute need not be used.
 

 In
 
 Lindsey
 
 v.
 
 State,
 
 69 Ohio St., 215, 69 N. E., 126, the defendant was convicted of murder in the second degree, which requires that the killing be done purposely and maliciously. The court held that an indictment charging that the defendants “did unlawfully,
 
 *512
 
 purposely, and in attempt to perpetrate a robbery, kill and murder tbe deceased, sufficiently charges murder in the second degree, although the word malice is not employed in the indictment in describing the act.”
 

 In commenting on this ruling, Judge Spear said at page 231:
 

 “The specific claim is that the word malice in defining the act of killing, is not found in the indictment. This statement is true. It is true, also, that Section 7217, Revised Statutes, provides that in an indictment for murder in the second degree it shall be sufficient to charge that the defendant did purposely and maliciously kill the deceased. This section does not, however, provide that the words stated are indispensable, and are the only words that' may be sufficient in an indictment in defining that crime. The section makes it unnecessary ‘to set forth the manner in which, or the means by which, the death was caused, ’ but an inference does not follow that the indictment may not set forth the manner or the means by which the death was caused, nor that, if such manner and means, as set forth, necessarily import malice and that the killing was therefore maliciously done, that is not the equivalent of a direct charge that the defendant. did maliciously kill. It is held in
 
 Robbins
 
 v.
 
 The
 
 State, 8 Ohio St., 131, that ‘intentional killing by means of administering poison, includes and
 
 per se
 
 imports malice.’ If the inference follows in a killing by administering poison why not in a killing while committing, or attempting to commit, a robbery, as’ both offenses are covered by the same section 'of the statute. ’ ’ ,
 

 Therefore, if the manner and means used, as set forth in the indictment, show the act was done maliciously the indictment is sufficient.
 

 In this case, the charge against the defendant was that “he unlawfully shot one Daniel Earl Wagoner with intent to wound.” If the shot was fired unlawfully with intent to wound and contrary to the statute,
 
 *513
 
 it was done maliciously. As was said in
 
 Weaver
 
 v.
 
 State,
 
 24 Ohio St., 584, at 590: “The shooting with intent to kill being established, the law implies malice; and the malice thus implied, can only be rebutted by showing circumstances of justification or excuse.”
 

 This indictment did in fact allege a malicious act, and an amendment was therefore unnecessary.
 

 It might be pointed out, however, that by the amendment the defendant was in no wise prejudiced. His counsel did not ask for any continuance or make any claim that he was prejudiced. He was merely standing on a right which he claimed existed, and which would have been given consideration in the days when technicalities and ingenuity flourished in criminal trials.
 

 In modern days, the amendment'being immaterial as we have shown, it was quite proper for the court to permit it. See Section 13437-29, General Code;
 
 Breinig
 
 v.
 
 State,
 
 124 Ohio St., 39, 176 N. E., 674;
 
 State
 
 v.
 
 Whitmore,
 
 126 Ohio St., 382, 185 N. E., 547;
 
 State
 
 v.
 
 Hutton,
 
 132 Ohio St., 461, 9 N. E. (2d), 295.
 

 The principal question involved is’ whether the facts proven warrant a conviction of Childers of the offense of shooting with intent to wound. This is the first time in its history that this court has been called upon to pass upon the legality of spring guns, although there is no dearth of such cases in other jurisdictions.
 

 Counsel for defendant claims that, since there is no specific statute in Ohio making it unlawful to set a spring gun on one’s own property, no crime was committed by Childers. See
 
 Johnson
 
 v.
 
 State,
 
 66 Ohio St., 59, 63 N. E., 607, 90 Am. St. Rep., 564, 61 L. R. A., 277. If, however, the proof adduced brings the acts of the defendant within the provisions' of Section 12420, General Code, a-.specific statute would be unnecessary.
 

 At early common law, the setting of a spring gun was not in itself unlawful, and if a person was killed by it while attempting to commit a felony no criminal
 
 *514
 
 liability ensued.
 
 Deane
 
 v.
 
 Clayton,
 
 7 Taun., 489 (1817);
 
 Ilott
 
 v.
 
 Wilkes,
 
 3 Barn. & Aid., 304 (1820). This rule in England has now been changed by statute to cover acts such as this. See 14
 
 &
 
 15 Vict. c. 19, s. 4 and 54 & 55 Viet. c. 69, s. 1. In this country, at least one state has adopted a statute making spring guns unlawful.
 
 Schmidt
 
 v.
 
 State,
 
 159 Wis., 15, 149 N. W., 388, Ann. Cas. 1916E, 107.
 

 However, the early common law of England has never been followed in this country. The right to set a trap in defense of one’s own dwelling has sometimes found approval in our courts as well as in England under its statute. Some early cases have indicated that protection of property is also a justification.
 

 In 1832, in the case of
 
 Gray
 
 v.
 
 Combs,
 
 7 Ky., 478, when a slave attempted to break into a warehouse and was shot and killed by a trap gun, the slave owner was not permitted to recover, on the ground that the shooting was done in prevention of a felony.
 

 In
 
 Aldrich
 
 v.
 
 Wright,
 
 53 N. H., 398, 16 Am. Rep., 339, it was held not to be unlawful to set a gun which killed four fur-bearing mink which were damaging the owner’s property.
 

 Both of these cases, under the peculiar circumstances of the law, involved property rights' solely, and the questions arose in civil actions.
 

 In
 
 State
 
 v.
 
 Moore,
 
 31 Conn., 479, the court said that the mere setting of a spring gun on one’s own premises for their protection is not unlawful in itself. If it would become a public nuisance, however, the court said a person so setting it could be prosecuted.
 

 The rules set out in these three cases are somewhat broader than the one generally adhered to in this country. By the overwhelming weight of authority, a person is not justified in taking human life or inflicting bodily harm upon the person of another by means of traps, spring guns, or other instruments' of destruction, unless, as a matter of law, he would have been
 
 *515
 
 justified had he been personally present and had taken the life or inflicted the bodily harm with his own hands.
 
 Simpson
 
 v.
 
 State,
 
 59 Ala., 1;
 
 State
 
 v.
 
 Beckham,
 
 306 Mo., 566, 267 S. W., 817;
 
 State
 
 v.
 
 Green,
 
 118 S. C., 279, 110 S. E., 145;
 
 Pierce
 
 v.
 
 Commonwealth,
 
 135 Va., 635, 115 S. E., 686, 28 A. L. R., 864;
 
 State
 
 v.
 
 Barr,
 
 11 Wash., 481;
 
 State
 
 v.
 
 Marfaudille,
 
 48 Wash., 117;
 
 Schmidt
 
 v.
 
 State, supra
 
 (under statute);
 
 United States
 
 v.
 
 Gilliam,
 
 1 Hayw. & H. (D. C.), 109, Fed. Cas. No. 15205a. See also 31 Yale Law Journal, 562; 70 U. of Pa. Law Rev., 334.
 

 Tested by these principles, one might set a spring gun in his own home, and if its discharge-prevented the ingress of a burglar, he might be justified because if he had been present he could have fired the shot. Has he the right, however, to set such a gun in an open field to prevent trespassers from entering his' melon patch?
 

 A criminal act may be committed through an innocent agent as well as in person.
 
 Brunson
 
 v.
 
 State,
 
 124 Ala., 37, 27 So., 410;
 
 Johnson
 
 v.
 
 State,
 
 142 Ala., 70, 38 So., 182;
 
 Adams
 
 v.
 
 People,
 
 1 N. Y., 173;
 
 Collins
 
 v.
 
 State,
 
 50 Tenn., 14;
 
 State
 
 v.
 
 Learnard,
 
 41 Vt., 585. There are many instances where the defendant is deemed to have committed a crime although not personally present at the time the act was performed.
 
 Blackburn
 
 v.
 
 State,
 
 23 Ohio St., 146;
 
 State
 
 v.
 
 Wolkow,
 
 110 Kan., 722, 205 P., 639, 42 A. L. R., 265;
 
 State
 
 v.
 
 Fulkerson,
 
 61 N. C., 233.
 

 No one should be permitted to do indirectly what he may not do directly. Defendant’s absence from the scene of the shooting should not enlarge his rights.
 

 In this case, the facts are to be considered just as if Childers, himself, was in the melon patch-and fired the shot, or as if he had stationed another there to fire a shot in case trespassers entered the patch. Childers knew that if anyone came in contact with the wires the gun would be discharged. It was not only the natural and probable consequence that bodily in
 
 *516
 
 juries would be received iu that event, but it was also his intention that they should be inflicted.
 

 Daniel Earl Wagoner was a boy fourteen years of age. He was a mere trespasser entering upon Childers land to commit at most a petit larceny by eating his melons. While a person has a right to protect his property from a trespass, and, after warning or notice to the trespasser, use such force as is reasonably necessary so to do, he cannot unlawfully use fire arms to expel the intruder where he has no reasonable ground to fear the trespasser will do him great bodily harm. 39 Ohio Jurisprudence, 487 and 488, Section 43;
 
 Carpenter
 
 v.
 
 State,
 
 62 Ark., 286;
 
 Bloom
 
 v.
 
 State.
 
 155 Ind., 292, 58 N. E., 81;
 
 State
 
 v.
 
 Vance,
 
 17 Iowa, 138;
 
 State
 
 v.
 
 Metcalfe,
 
 203 Iowa, 155, 212 N. W., 382;
 
 People
 
 v.
 
 Capello,
 
 282 Ill., 542, 118 N. E., 927;
 
 Utterbach
 
 v.
 
 Commonwealth,
 
 105 Ky., 723, 49 S. W., 479, 88 Am. St. Rep., 328;
 
 Stacey
 
 v.
 
 Commonwealth,
 
 189 Ky., 400, 225 S. W, 37, 25 A. L. R., 490;
 
 State
 
 v.
 
 Ciaccio,
 
 163 La., 563, 112 So., 486;
 
 State
 
 v.
 
 Gilman,
 
 69 Me., 163 ;
 
 State
 
 v.
 
 Morgan,
 
 25 N. C., 186, 38 Am. Dec., 714;
 
 Pierce
 
 v.
 
 Commonwealth, supra; State
 
 v.
 
 Clark,
 
 51 W. Va., 457, 41 S. E., 204, 25 A. L. R., 525; 32 A. L. R., 1541; 34 A. L. R., 1488.
 

 The jury found that no warning was given Wagoner and that the force used was unnecessary to prevent the trespass. Had Wagoner been killed, a homicide charge could have been instituted. Not having lost his life but having received a great bodily injury, a charge of shooting with intent to wound was fully sustained by the evidence.
 

 The nature of the defendant’s act and its maliciousness are best described in
 
 State
 
 v.
 
 Simpson, supra,
 
 at page 16: “The secrecy and frequency of the trespass would not justify the owner in concealing himself, and with a deadly weapon taking the life, or grievously wounding the trespasser, as he crept stealthily to do the wrong intended. What difference is there in his
 
 *517
 
 concealing Ms person, and weapon, and inflicting unlawful violence, and contriving and setting a mute, concealed agency or instrumentality which will inflict the same, or it may be greater violence? In each case, the intention i% the same, and it is to exceed the degree of force the law allows to be exerted. In the one ease, if the trespasser came not with an unlawful intent — if his trespass was merely technical — if it was a child, a madman, or an idiot, carelessly, thoughtlessly entering and wandering on the premises, the owner would withhold all violence. Or, he could exercise a discretion, and graduate his violence to the character of the trespass. The mechanical agency is sensitive only to the touch — it is without mercy, or discretion, its violence falls on whatever comes in contact with it. Whatever may not be done directly cannot be done by circuity and indirection. If an owner, by means of spring guns or other mischievous engines planted on his premises, capable of causing death or of inflicting great bodily harm on ordinary trespassers, does cause death, he is guilty of criminal homicide.”
 

 Counsel for defendant,'in his brief, maintains the following:
 

 “The setting of the spring gun on his own premises by Childers was at most a menace only. Childers violated no statute by setting the spring gun in his melon patch. If Wagoner had seen Childers place the gun and believed that he placed it to entrap him, Wagoner, he would have had no right to enter on the premises of Childers and, remove the gun therefrom. The setting of the spring gun by Childers was not such an act that Wagoner would have a right to use or could use force in restraining him from so doing. The person assailed or assaulted has a right to use force to repel the assault. If Wagoner saw Childers placing the gun, he would have no right to enter on the premises of Childers and undertake to prevent him from setting it.”
 

 The argument is fallacious. The setting of the gun
 
 *518
 
 created a menace and a nuisance, calculated to impose great bodily harm on those who entered the melon patch. If Wagoner saw Childers in the patch with a shotgun, he could not enter and take the gun away from him. If, however, Childers without just cause fired the shotgun and hit Wagoner in order to prevent a mere trespass, a crime was committed. The unlawful act is the shooting itself. One may shoot in self-defense, but if he shoots another maliciously and intentionally without justification the law is violated.
 

 In accordance with the great weight of authority, one who sets a spring gun or trap does so at his peril. If it is set in a dwelling house and prevents the entrance of a felon, the justification may be sufficient to acquit the owner. If on the other hand it inflicts death or great bodily harm on an innocent person, or one Who is a mere trespasser, the one who set the trap must suffer the consequences. He is presumed to intend the natural and probable results of his voluntary act. It becomes as much of an assault on another as if he was personally present and pulled the trigger.
 

 If Childers was vexed by secret trespassers or marauders, he could have found protection by his own vigilance within lawful limits. He could have provided a stronger enclosure or kept a more constant watch. If these had failed, an appeal to the agencies of the law would no doubt have given him adequate protection. His reckless disregard for the value of human life can find neither sanction within the law, nor sympathy without, from this court.
 

 By setting the trap, Childers must be held responsible for that which happened just as if he had been personally present. The boy, Wagoner, was a mere trespasser and unarmed. Childers could not maintain a claim of self-defense or that the shooting was accidental. Under such circumstances', the jury was fully warranted in finding him guilty of a violation of the provisions of Section 12420, General Code.
 

 
 *519
 
 Upon a review of the entire record, this court is of the opinion that the judgment of the Court of Appeals should be, and the same hereby is, affirmed.
 

 Judgment affirmed.
 

 Weygandt, C. J., Matthias, Day, Zimmerman, Williams and Myers, JJ., concur.